UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
LOLA BODANSKY,                       :
                        Plaintiff,   :
                                     :
            -v-                      :      09 Civ. 4651 (DLC)
                                     :
FIFTH ON THE PARK CONDO, LLC,        :
EYTAN BENYANIN, and ROBERT EZRAPOUR, :
                        Defendants.  :
                                     :
------------------------------------ X      OPINION & ORDER
                                     :      ‾‾‾‾‾‾‾‾‾‾‾‾‾
STEVE BERGEN and LYNNE SCHALMAN,     :
                        Plaintiffs,  :
                                     :
            -v-                      :
                                     :      09 Civ. 6433 (DLC)
FIFTH ON THE PARK CONDO, LLC,        :
EYTAN BENYANIN, and ROBERT EZRAPOUR, :
                        Defendants.  :
                                     :
------------------------------------ X

Appearances:

For Plaintiffs:

Lawrence C. Weiner
Alan Wasserman
Wilentz, Goldman & Spitzer P.A.
90 Woodbridge Center Drive
Woodbridge, NJ 07095

For Defendants:

Daniel A. Ross
Sandra Rampersaud
Derek I. A. Silverman
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

DENISE COTE, District Judge:

This dispute arises out of the efforts of the plaintiffs, purchasers of units in a condominium development in New York City, to rescind their purchase agreements based on alleged violations of the registration and disclosure requirements of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701-1720 (2009) ("ILSA" or the "Act"). The developer and its managing members, defendants here, claim that the condominium qualifies for certain exemptions under the Act. The interpretation of the Act, specifically the applicability of the exemptions invoked by defendants, is a matter of first impression in this circuit. For the following reasons, the condominium development is exempt from the Act's registration and disclosure requirements. Plaintiffs' claims are therefore dismissed and judgment is entered in favor of defendants.

BACKGROUND

The following facts are undisputed. Defendant Fifth On The Park Condo, LLC ("Fifth"), is the sponsor of a new condominium development known as Fifth on the Park Condominium (the "Condominium") located at 1485 Fifth Avenue, New York, New York. Defendants Eytan Benyanin and Robert Ezrapour (the "individual defendants," and collectively with Fifth, the "defendants") are the managing members of Fifth Equities, LLC, the managing member

2

of Fifth.  On April 5, 2007, a New York State Offering Plan (the "Offering Plan") was filed with the New York State Attorney General's Office on behalf of the Condominium which indicated that the Condominium would consist of 160 residential units.[1]

Sales of units in the Condominium began in or around 2007. Plaintiffs Lola Bodansky ("Bodansky"), Steve Bergen ("Bergen"), and Lynne Schalman ("Schalman") (collectively, the "plaintiffs") are purchasers of units in the Condominium.  On June 15, 2007, Bergen and Schalman signed a contract to purchase Unit 11F in the Condominium for $999,999 and paid a deposit of $49,999.  On November 16, 2007, Bodansky signed a contract to purchase Unit 18/19B in the Condominium for $1,430,400 and paid a deposit of $143,000.  Prior to executing their contracts to purchase units in the Condominium, plaintiffs were provided a copy of the Offering Plan, including all amendments that were in effect on the date that they signed their contracts.

In early 2009, the plaintiffs began to explore ways to get out of their contracts.  By letter dated April 29, 2009, Bodansky sent a letter notifying Fifth that she intended to rescind her purchase agreement due to Fifth's violation of the registration and disclosure requirements of ILSA.  Bergen and Schalman sent a similar notice to Fifth on June 2, 2009.

---

[1] The Offering Plan was later amended to provide for 157 residential units.  This amendment does not affect the conclusion reached herein.

Plaintiffs claimed that since Fifth did not provide them with a written property report for the Condominium prior to signing purchase agreements, as required for all non-exempt units in a condominium covered by the Act, they were entitled to rescission of their purchase agreements and return of their deposits.  It is not disputed that plaintiffs gave defendants timely notice of their intent to rescind their purchase agreements pursuant to the Act.

Defendants first learned of ILSA in January 2009. Defendants concede that they did not file a statement of record for the Condominium with the federal Department of Housing and Urban Development ("HUD"), provide plaintiffs with a written property report prior to execution of their purchase agreements, or include any reference to ILSA or its requirements in the purchase agreements signed by plaintiffs.  Defendants refused to rescind plaintiffs' contracts or to return their deposits.  On May 18, Bodansky filed a complaint seeking rescission of her contract, return of her deposit, accrued interest, and attorneys' fees and costs pursuant to ILSA, 15 U.S.C. § 1709. Bergen and Schalman filed a similar complaint on July 20.[2]

---

[2] Four additional lawsuits were subsequently filed against the defendants by purchasers of units in the Condominium.  The additional lawsuits raise the same claims as those asserted by plaintiffs in the two cases addressed by this Opinion and were accepted as related by this Court.  The other four cases have been stayed pending resolution of plaintiffs' claims here.

On May 26, 2009, defendants received notice that HUD was conducting an investigation into whether the Condominium complied with ILSA's registration and disclosure requirements. On August 18, defendants responded to the HUD inquiry indicating that only ninety residential units in the Condominium were either subject to a contract for sale or had been sold at that time.[3]  The August 18 letter further indicated that defendants would not enter into any more contracts for the sale of additional units in the Condominium prior to the issuance of a temporary certificate of occupancy ("TCO") for all units in the building.[4]  Based on these contentions, defendants represented to HUD that the Condominium is exempt from ILSA's registration and disclosure requirements pursuant to 15 U.S.C. §§ 1702(b)(1) and 1702(a)(2).  Between defendants' response to HUD on August 18, and the issuance of a TCO for the entire Condominium on September 10, defendants did not enter into any contracts to sell additional units in the Condominium.  HUD has not notified the defendants that it has made any determination regarding Fifth's compliance with the Act.

---

[3] Fifth's response to HUD indicated that some additional units had been subject to contracts which were later terminated.  The total number of units which were ever subject to contracts, however, was under one hundred.

[4] A TCO is issued when a unit can be legally occupied and is physically habitable.

A bench trial was scheduled for January 26, 2010.  The parties filed their pretrial submissions on December 18, 2009. Each party filed a responsive memorandum of law on January 15, 2010.  At a final pretrial conference held on January 22, the parties stipulated that the matter could be decided based on their written submissions.  This Opinion constitutes the Court's findings of fact and conclusions of law.

DISCUSSION

This dispute hinges on the interpretation of ILSA, specifically the exemptions invoked by defendants.  The parties agree that Fifth is subject to certain of the Act's provisions, but disagree as to whether Fifth is exempt from the Act's registration and disclosure requirements.

ILSA was enacted as part of the Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title XIV, 82 Stat. 590 (1968), and was extensively amended in 1979.  See Pub. L. No. 96-153, Title IV, 93 Stat. 1122 (1979).  The Act was "designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers."  Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1978).  The

Act makes it unlawful for a developer of a covered "subdivision"[5] to "make use of any means or instruments of transportation or communication in interstate commerce, or of the mails . . . to sell or lease any lot unless a statement of record with respect to such lot is in effect . . . [and] a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee."  15 U.S.C. § 1703(a)(1); see also 24 C.F.R. § 1710.3.[6]

The printed property report, which is a condensed version of the statement of record filed with HUD, is prepared by the developer.  It contains extensive information concerning the title of the land; the terms and conditions for disposing of

---

[5] "Subdivision" is defined as "any land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."  15 U.S.C. § 1701(3).  "Common promotional plan" is defined, in pertinent part, as "a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease."  Id. § 1701(4).

[6] Because the Act was originally targeted at combating fraudulent practices concerning unimproved land, the term "lot" is used throughout the Act.  The parties do not dispute that the term "lot" also applies to condominium units.  Indeed, HUD Guidelines make it clear, and other courts have found, that a "lot" may also mean a condominium unit.  See Guidelines for Exemptions Available Under ILSA, 61 Fed. Reg. 13,596, 13,602 (Mar. 27, 1996) ("Lot means any portion, piece, division, unit or undivided interest in land if such interest includes the right to exclusive use of a specific portion of the land or unit. This applies to the sale of a condominium . . . as well as a traditional lot."); see also Winter v. Hollingsworth Properties, 777 F.2d 1444, 1447-49 (11th Cir. 1985); Beauford v. Helmsley, 740 F.Supp. 201, 209-10 (S.D.N.Y. 1990).

lots; the conditions of the subdivision, including access, noise, safety, sewage, utilities, proximity to municipalities, and the nature of the developer's proposed improvements; various other specified data; and such additional matters "as the Secretary [of HUD] may require as being reasonably necessary or appropriate for the protection of purchasers." See 15 U.S.C. §§ 1705, 1707.  Unless an exemption applies, the developer must provide the property report to the purchaser prior to executing the purchase agreement.  Id. § 1703(a)(1)(B).  If the developer fails to do so, the purchaser has the option of revoking her contract within two years from the date of signing, id. § 1703(c), and may be entitled to a return of any monies paid pursuant to the agreement.  Id. § 1703(e).  The purchaser's right of revocation must be acknowledged in the purchase agreement.  Id. § 1703(c).

The Act, however, provides for two types of exemptions from its requirements: (1) full statutory exemptions, set forth in 15 U.S.C. § 1702(a), which discharge a developer from the Act's disclosure and registration requirements as well as its anti-fraud provisions; and (2) partial statutory exemptions, set forth in 15 U.S.C. § 1702(b), which discharge a developer from the Act's disclosure and registration requirements, but not its anti-fraud provisions.

The particular exemption on which this case turns is the so-called "Hundred Lot Exemption" set forth in 15 U.S.C. § 1702(b)(1). Section 1702(b)(1) provides, in pertinent part:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions requiring registration and disclosure . . . shall not apply to the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under [§ 1702(a)].

15 U.S.C. § 1702(b)(1) (emphasis added). Among the exemptions available under § 1702(a) is the "Improved Lot Exemption," which exempts "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." 15 U.S.C. § 1702(a)(2) (emphasis added).

By "stacking" the Hundred Lot Exemption, § 1702(b)(1), and the Improved Lot Exemption, § 1702(a)(2), defendants claim that Fifth is exempt from the Act's registration and disclosure requirements.[7] The defendants argue that because Fifth had sold fewer than one hundred unfinished units in the Condominium as of the date that the TCO was issued for the entire building, and because the remaining units are now completed and thus qualify

---

[7] Fifth concedes that it remains subject to ILSA's anti-fraud provisions. Plaintiffs, however, do not allege that Fifth violated any of the anti-fraud provisions. As such, these provisions are not at issue here.

for the Improved Lot Exemption, the Hundred Lot Exemption
applies.  Plaintiffs contend, however, that the Hundred Lot
Exemption applies only if at the time of the execution of a
purchaser's sales contract, fewer than one hundred non-exempt
units were being <u>offered</u> for sale in the subdivision pursuant to
a common promotional plan.  Since Fifth's Offering Plan
indicated that 160 units were available for sale in the
Condominium as of April 5, 2007, plaintiffs argue that Fifth
cannot avail itself of the Hundred Lot Exemption.  The parties'
dispute thus hinges on a question of statutory interpretation.

    "Statutory interpretation always begins with the plain
language of the statute, which [a court] consider[s] in the
specific context in which that language is used, and the broader
context of the statute as a whole."  <u>In re Ames Dept. Stores,</u>
<u>Inc.</u>, 582 F.3d 422, 427 (2d Cir. 2009) (citation omitted).  A
court may "turn to the legislative history only when the plain
statutory language is ambiguous or would lead to an absurd
result."  <u>Id</u>.  "Where the statute's language is plain, the sole
function of the courts is to enforce it according to its terms."
<u>United States v. Hasan</u>, 586 F.3d 161, 167 (2d Cir. 2009)
(citation omitted).

    The statutory language at issue here is clear.  The text of
§ 1702(b)(1) states that ILSA's registration and disclosure
requirements do not apply to "the sale or lease of lots in a

10

subdivision <u>containing fewer than one hundred lots which are not</u>
<u>exempt</u> under [§ 1702(a)]." 15 U.S.C. § 1702(b)(1) (emphasis
added). The plain meaning of the text is that as long as the
"subdivision" contains "fewer than one hundred" non-exempt lots,
then the Act's registration and disclosure requirements do not
apply to the sale of lots in that subdivision. Thus, the
Hundred Lot Exemption can still apply to a subdivision
containing one hundred or more lots as long as all lots sold
<u>above</u> the ninety-nine non-exempt lots maximum will be covered by
a § 1702(a) exemption. For instance, the Hundred Lot Exemption
applies where a developer contracts to sell up to ninety-nine
non-exempt lots in a 200-lot subdivision, but will sell the
remaining 101 lots either as improved lots or pursuant to
contracts obligating the developer to improve the lots within
two years.

    Plaintiffs' argument that the Hundred Lot Exemption applies
only if at the time a purchase agreement is signed, fewer than
one hundred non-exempt lots are offered for sale in the
subdivision is unsupported by the text of the statute.
"[Courts] must interpret a statute as it is, not as it might be,
since courts must presume that a legislature says in a statute
what it means and means in a statute what it says." <u>Life</u>
<u>Receivables Trust v. Syndicate 102 at Lloyd's of London</u>, 549
F.3d 210, 216 (2d Cir. 2008) (citation omitted). Plaintiffs

point to nothing in the text of § 1702(b)(1), or any other provision of ILSA, to suggest that the determination of a developer's eligibility for the Hundred Lot Exemption must be determined at the time of sale of any particular lot.  In fact, plaintiffs concede that the "specific requirements for when a developer must implement its plan to apply [exemptions] are not discussed in 15 U.S.C. § 1702(b)(1)."

Further, there is no textual support for plaintiff's suggestion that a developer must have some sort of formal "plan" in place at the time any particular unit is sold in order to qualify for the Hundred Lot Exemption.  The text of the statute does not limit the availability of the Hundred Lot Exemption only to subdivisions in which the developer offers for sale fewer than one hundred non-exempt lots from the outset. Instead, a developer may rely on the Hundred Lot Exemption as long as it has assured itself that the subdivision will "contain[] fewer than one hundred lots which are not exempt under [§ 1702(a)]."  Plaintiffs' interpretation of § 1702(b)(1), which imposes a restriction on the availability Hundred Lot Exemption that does not exist in the text of the statute, is therefore rejected.

If Congress had intended to limit the availability of the Hundred Lot Exemption to situations where the developer initially offers for sale fewer than one hundred non-exempt

12

lots, it could have done so.  For instance, Congress could have
drafted § 1701(b)(1) to exempt "the sale . . . of lots in a
subdivision containing at the time of initial offering fewer
than one hundred lots which are not exempt under [§ 1702(a)]."
The fact that Congress did include such timing requirements in
other exemptions under § 1702(b), but not in § 1702(b)(1),
demonstrates that Congress did not intend such a limitation to
be read into the Hundred Lot Exemption.[8]  See McInerney v.
Rensselaer Polytechnic Institute, 505 F.3d 135, 138 (2d Cir.
2007) ("It is a general principle of statutory construction that
when Congress includes particular language in one section of a
statute but omits it in another section of the same Act, it is
presumed that Congress acts intentionally and purposely.").
Instead, the text does not specify the point in time at which
the number of non-exempt lots "contain[ed]" in a subdivision
must be measured.  This makes sense given that a developer may
build and market a subdivision comprised of more than ninety-
nine lots, but sell a portion of the lots as improved lots or
pursuant to contracts to improve the lots within two years.  As
long as a developer does not enter into contracts to sell more

---

[8] For example, § 1702(b)(2) provides an exemption for "the sale
or lease of lots in a subdivision if, within the twelve-month
period commencing on the date of the first sale or lease of a
lot in such subdivision after the effective date of this
subsection,  . . . not more than twelve lots are sold or leased
. . . ."  15 U.S.C. § 1702(b)(2) (emphasis added).

than ninety-nine non-exempt lots in the subdivision, it may take advantage of the Hundred Lot Exemption.

Both parties cite to HUD's interpretations of the Hundred Lot Exemption in its regulations and interpretive guidelines for ILSA.  Where the text of a statute is unambiguous, no deference to an agency's interpretation of the statute is necessary.  See United Airlines, Inc. v. Brien, 588 F.3d 158, 172 (2d Cir. 2009) ("Deference to an agency's statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." (citing Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581, 600 (2004)).[9]  Nevertheless, the interpretation of the Hundred Lot Exemption adopted in this Opinion is consistent with the regulations issued by HUD pursuant to its authority to promulgate "rules and regulations" under ILSA.  See 15 U.S.C. § 1718.

---

[9] "Chevron requires that courts undertake a two-step inquiry when reviewing an agency's construction of a statute that comes within its purview.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  Only if the statute is silent or ambiguous with respect to the specific issue, should the reviewing court reach the second question, namely, whether the agency's answer is based on a permissible construction of the statute." United States v. Connolly, 552 F.3d 86, 89 (2d Cir. 2008) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).

The Hundred Lot Exemption is enacted in HUD's regulations at 24 C.F.R. § 1710.6 and provides, in pertinent part:  "The sale of lots in a subdivision is exempt from the registration requirements of the Act if, since April 28, 1969, the subdivision has contained fewer than 100 lots, exclusive of lots which are exempt from jurisdiction under § 1710.5 [which covers the Improved Lot Exemption]."). 24 C.F.R. § 1710.6 (emphasis added).  Like the statutory text on which it is based, § 1710.6 contains no requirement that the determination of which units in a condominium "are exempt from jurisdiction under § 1710.5" occur at the time of sale of a particular lot.  Instead, the plain meaning of § 1710.6 is that the sale of a unit in a condominium development is exempt from the Act's registration and disclosure requirements as long as the development contains fewer than one hundred non-exempt units, i.e., units sold prior to completion.

This interpretation is buttressed by the fact that a developer's eligibility for exemptions under ILSA is "self-determining."  See 24 C.F.R. § 1710.4(d).  As such, "a developer is not required to file notice with or obtain the approval of [HUD] in order to take advantage of an exemption."  Id.  Rather, "[i]f a developer elects to take advantage of an exemption, the developer is responsible for maintaining records to demonstrate that the requirements of the exemption have been met."  Id.  The

15

"self-determining" nature of a developer's eligibility for exemptions under ILSA further demonstrates that the Hundred Lot Exemption does not require that its application be determined contemporaneous with the sale of any particular lot, or be limited to subdivisions where fewer than one hundred non-exempt lots are initially offered for sale.

HUD has also issued interpretive guidelines for exemptions under ILSA ("Guidelines"), which "clarify agency policies and positions with regard to the exemption provisions of [ILSA] and its implementing regulations." See Guidelines for Exemptions Available under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13,596, 13,601 (Mar. 27, 1996).[10]  Although such Guidelines "are not formally promulgated as regulations, such agency publications are at least a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Conroy v. New York State Dept. of Correctional Services, 333 F.3d 88, 95 (2d Cir. 2003) (citation omitted).[11]  Moreover, an agency's interpretation of its own

---

[10] The Guidelines concerning the Hundred Lot Exemption were first published for public comment in 1983, see 48 Fed. Reg. 44,412, 44,417 (Sept. 28, 1983), and were finalized a year later.  See 49 Fed. Reg. 31,375, 31,379-80 (Aug. 6, 1984).  The Guidelines were reissued in 1996.  See 61 Fed. Reg. 13,596, 13,605 (Mar. 27, 1996).

[11] Generally, an administrative agency's guidelines are interpretive rules entitled to "some deference" in the judicial interpretation of the agency's statute.  Reno v. Koray, 515 U.S. 50, 61 (1995) (internal agency guideline, which is not "subject

regulation is entitled to deference and is "controlling unless plainly erroneous or inconsistent with the regulation." <u>Singh v. Mukasey</u>, 536 F.3d 149, 154 (2d Cir. 2008) (citing <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997)).

The Guidelines accord with the interpretation of the Hundred Lots Exemption adopted herein. For example, the Guidelines offer the following illustration:

> [A] developer of a subdivision containing a total of 129 lots since April 28, 1969, qualifies for [the Hundred Lot Exemption] if at least 30 lots <u>are sold</u> in transactions that are exempt because the lots had completed homes erected on them. The 30 exempt transactions may fall within any one exemption or a combination of exemptions noted in [24 C.F.R.] § 1710.5 [including the Improved Lot Exemption] . . . and may be <u>either past or future sales</u>. In the above example, the developer also could qualify if twelve lots had been sold with residential structures already erected on them, nine lots had been sold to building contractors and at least nine lots <u>were reserved</u> for either the construction of homes by the developer or for sales to building contracts. <u>The reserved lots need not be specifically identified.</u>

61 Fed. Reg. at 13,604 (emphasis added). This example shows that HUD does not require that the Hundred Lot Exemption be determined at the time of a sale of a particular lot in a subdivision. Instead, the Guidelines contemplate that because the Improved Lot Exemption (or another exemption under 24 C.F.R.

---

to the rigors of the Administrative Procedure Act, including public notice and comment," is entitled to "some deference" (citation omitted)). The Guidelines for ILSA, however, were not simply promulgated by HUD in an informal process, but went through a public comment and review process similar to that for regulations. <u>See</u> 49 Fed. Reg. at 31,375.

§ 1710.5) may apply to "either past or future sales," the
Hundred Lot Exemption is available even if the subdivision
initially contains more than ninety-nine potentially non-exempt
lots.  The Guidelines also note that a developer may "reserve"
lots to be sold pursuant to a § 1702(a) exemption, but need not
"specifically identify[y]" such lots.  The future of those lots
-- i.e., whether they will be sold as exempt or non-exempt lots
-- and thus the availability of the Hundred Lot Exemption, is in
the hands of the developer.

That a violation of ILSA occurs when a developer in fact
sells one hundred or more non-exempt units in a condominium
development, rather than when a developer merely offers for sale
more than one hundred non-exempt units, is further evidenced in
the continuation of the above illustration:

> Developers of subdivisions containing more than 99
> lots who wish to operate under this exemption must
> assure themselves that all lots in excess of 99 have
> been and will be sold in transactions exempt under 24
> CFR 1710.5 . . . .  The sale of more than 99 lots in
> transactions not exempt under § 1710.5 . . . would
> nullify this exemption for prior and future sales and
> might result in prior sales being voidable at the
> purchaser's option.

61 Fed. Reg. at 13,604 (emphasis added).  This example thus
makes clear that the Hundred Lot Exemption can apply as long as
fewer than one hundred non-exempt lots are ultimately sold in a
subdivision containing one hundred or more lots.  That a
developer bears the risk of "prior sales being voidable at the

purchaser's option," as set forth in 15 U.S.C. § 1703(c), if more than 99 non-exempt lots are sold, is consistent with the fact that eligibility for exemptions under ILSA is "self-determining." See 24 C.F.R. § 1710.4(d).[12]

The primary case upon which plaintiffs rely in arguing against this interpretation of the Hundred Lot Exemption is 200 East Partners, LLC. v. Gold, 997 So.2d 466 (Fla. Dist. Ct. App. 2008). In 200 East, the court interpreted § 1702(b)(1) to require that a developer "perfect" its eligibility for the Hundred Lot Exemption at the time a purchaser executes the purchase agreement. Id. at 469. The dispute in 200 East involved a 115-unit condominium project in Florida. The developer planned, upon the first sale in excess of ninety-nine units in the project, to guarantee completion of construction within two years for the remaining sixteen units, thereby

---

[12] Defendants also cite a favorable July 17, 2009 advisory opinion issued by HUD for a different condominium development called Hunters Point in Long Island City, New York. Advisory opinions, unlike regulations produced pursuant to "a formal adjudication or notice-and-comment rulemaking," do not have "the force of law." Christensen v. Harris County, 529 U.S. 576, 587 (2000). As such, interpretations contained in an advisory opinion "are entitled to respect . . ., but only to the extent that those interpretations have the power to persuade." Id. (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). The fact that the Hunters Point advisory opinion does not explain how HUD reached its conclusion diminishes its persuasive power. In any event, given that the text of § 1702(b)(1) is unambiguous, deference to any interpretation of the Hundred Lot Exemption by HUD in the Hunters Point advisory opinion is unnecessary.

exempting all sales pursuant to the Hundred Lot Exemption.  <u>Id.</u>
at 468.[13]  The court held that because the developer "failed to
<u>perfect</u> an exemption for all units of the 115 lot project <u>prior</u>
to the [plaintiffs] executing their purchase and sale
agreement," the developer violated ILSA by failing to provide a
printed property report to plaintiffs.  <u>Id.</u> at 469 (emphasis
added).[14]

The interpretation of a federal statute by a state court in
another circuit is not binding on this Court.  Moreover, the <u>200</u>
<u>East</u> court's interpretation of § 1702(b)(1) is unsupported by
the text of the statute.  The court's decision in <u>200 East</u> does
not explain how the text of § 1702(b)(1) justifies a rule that a
developer must "perfect" an exemption "prior" to the signing of

---

[13] The developer had obtained an advisory opinion from HUD
approving its plan to qualify for the Hundred Lot Exemption.
<u>Id.</u> at 467.

[14] The <u>200 East</u> court relied on an earlier Florida appellate
decision in <u>Grove Towers, Inc. v. Lopez</u>, 467 So.2d 358 (Fla.
Dist. Ct. App. 1985), also cited by plaintiffs, for the
proposition that ILSA requires that eligibility for the Hundred
Lot Exemption be determined at the time the purchase agreement
is executed.  In <u>Grove Towers</u>, the court held that because a
developer initially marketed a condominium as containing more
than one hundred units, even though the completed building only
contained ninety-eight units, the developer could not invoke the
Hundred Lot Exemption.  <u>Id.</u> at 361.  The court did not, however,
provide any textual justification for its interpretation of §
1702(b)(1), nor did it consider the regulations or Guidelines
promulgated by HUD.  Moreover, the court appears to have simply
disregarded the possibility that a subdivision containing one
hundred or more lots may still qualify for the Hundred Lot
Exemption as long as the units above ninety-nine qualify for a §
1702(a) exemption.

any purchase agreement, much less what "perfecting" an exemption under ILSA would require.  The notion that an exemption must be "perfected" at the time any particular purchase agreement is executed misapprehends the self-determining nature of the ILSA exemptions.  See 24 C.F.R. § 1710.4(d).  Furthermore, despite the issue being a matter of first impression in Florida, see 200 East, 997 So.2d at 468, the court did not closely examine the text of § 1702(b)(1) or 24 C.F.R. § 1710.6.  Although the court read HUD's Guidelines as not permitting a developer "to wait until the sale of a unit in excess of the first ninety-nine to qualify for an exemption for the remaining units," id., the court provided no textual support (or otherwise) for this interpretation.  The 200 East court's interpretation of § 1702(b)(1) is thus unpersuasive.[15]

---

[15] The only other case cited by plaintiffs that is arguably on point is Bair v. Atlantis LLC, No. 07 Civ. 4243 (NKL), 2008 WL 5051393 (W.D. Mo. Nov. 20, 2008).  Plaintiffs' reliance on Bair, however, is misplaced.  In Bair, the court held that "for purposes of the 100-lot exemption, the relevant number is not the number of units currently in existence, . . . but rather the number of units subject to a common promotional plan."  Id. at *4.  Because there were 240 units in the common promotional plan, the court found that the developer "would have to show that 141 of these units will qualify for exemptions under the Act in order for the transaction at issue in this case to qualify for the 100-lot exemption."  Id.  Since there was no evidence that sales of these units would qualify for exemptions under § 1702(a), the court held that the Hundred Lot Exemption did not apply.  As such, Bair's reading of the statute is not inconsistent with the interpretation of § 1702(b)(1) adopted herein.

Based on the text of 15 U.S.C. § 1702(b)(1), as interpreted herein and by HUD in ILSA regulations and the Guidelines, Fifth qualifies for the Hundred Lot Exemption.  Although the Offering Plan for Fifth originally indicated that 160 units were available for sale, only ninety purchase agreements were entered into before the Condominium was completed and the TCO was issued for the entire building.  As such, the remaining 70 units in the Condominium will necessarily qualify for the Improved Lot Exemption pursuant to § 1702(a)(2).  Because the Condominium is a "subdivision containing fewer than one hundred lots which are not exempt under [§ 1702(a)]," the sale of all units in the Condominium is exempt from ILSA's registration and disclosure requirements.  Accordingly, defendants were under no obligation to provide plaintiffs with a written property report and plaintiffs are not entitled to rescission of their contracts or return of their deposits.

Plaintiffs argue that even if the interpretation of § 1702(b)(1) adopted herein is correct, defendants cannot "retroactively" invoke exemptions to avoid ILSA's registration and disclosure requirements.  Under the Act, exemptions apply "[u]nless the method of disposition is adopted for the purposes of evasion of this chapter."  15 U.S.C. §§ 1702(a) and (b).[16]

---

[16] In support of their position, plaintiffs cite Gentry v. Harborage Cottages-Stuart, LLLP, 602 F.Supp.2d 1239 (S.D. Fla.

Plaintiffs point out that defendants were not even aware of ILSA or its requirements until January 2009, almost two years after plaintiffs signed their purchase agreements.  As such, plaintiffs contend that defendants cannot now take advantage of the Hundred Lot and Improved Lot Exemptions because the only reason for doing so would be to avoid ILSA's registration and disclosure requirements.  This argument is without merit.

Plaintiffs do not dispute that a developer may combine the Hundred Lot Exemption with another exemption under § 1702(a) to be exempt under ILSA.  Moreover, as noted above, plaintiffs concede that "the specific requirements for when a developer must implement its plan to apply [exemptions] are not discussed in 15 U.S.C. § 1702(b)(1)."  In any event, defendants have not adopted a "method of disposition" for the purposes of evading ILSA's requirements.  In fact, it would have been impossible for defendants to adopt any plan to evade ILSA prior to January 2009

---

2009).  In Gentry, the court interpreted the "purposes of evasion" language in §§ 1702(a) and (b) as requiring a developer to demonstrate a "legitimate business purpose" in structuring a development to fall within the Hundred Lot and Improved Lot Exemptions.  Id. at 1249.  Another court in the same district, however, has more recently held that merely "saving time and money" is a legitimate business purpose for invoking both exemptions.  See Double AA Intern. Inv. Group, Inc. v. Swire Pacific Holdings, Inc., No. 08 Civ. 23444, -- F.Supp.2d --, 2009 WL 4825097, at *11 (S.D. Fla. Dec. 15, 2009).  In any event, regardless of which interpretation of the "purposes of evasion" language in §§ 1702(a) and (b) is correct, or what qualifies as a "legitimate business purpose," these interpretations are not binding on this Court.

given that it was only then that defendants became aware of its requirements. Further, since the Condominium is now complete, the only possible "method of disposition" for the remaining units is to sell them as improved units, which are exempt under § 1702(a)(2). Defendants seek only to take advantage of the fact that the remaining seventy units in the Condominium qualify for the Improved Lot Exemption, which therefore renders the first ninety units exempt pursuant to the Hundred Lot Exemption. Fifth is entitled to do so based on the plain text of § 1702(b)(1), even if this "method of disposition" was not originally specified in some formal "plan" at the outset. A developer does not evade ILSA's requirements by taking conscious action to ensure that a subdivision meets the requirements of one or more exemptions that are explicitly provided in the statute.

CONCLUSION

Fifth is exempt from ILSA's registration and disclosure requirements pursuant to the Hundred Lot Exemption, 15 U.S.C. § 1702(b)(1), and the Improved Lot Exemption, 15 U.S.C. § 1702(a)(2).  Plaintiffs' claims for rescission of their purchase agreements, return of their deposits, and interest and attorneys' fees are dismissed.  The Clerk of Court shall enter final judgment in favor of defendants in both 09 Civ. 4651 and 09 Civ. 6433.  The Clerk of Court shall close these two cases.


        SO ORDERED:

Dated:    New York, New York
          January 29, 2010

                                    _____
                                           DENISE COTE
                                    United States District Judge

25